J-S14016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.A.I.-T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M.-T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1563 MDA 2023 |

Appeal from the Decree Entered October 13, 2023
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 88459

| | | |
|---|---|---|
| IN RE: E.C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M.-T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1564 MDA 2023 |

Appeal from the Decree Entered October 13, 2023
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 88460

| | | |
|---|---|---|
| IN RE: A.C.-R.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M.-T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1565 MDA 2023 |

Appeal from the Decree Entered October 13, 2023
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 88461

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY PANELLA, P.J.E.:                **FILED: JULY 9, 2024**

S.M.-T. ("Mother") appeals from the October 13, 2023 decrees involuntarily terminating her parental rights to her biological daughter, C.A.I.-T., born in January 2010, and her sons, E.C.R., born in July 2012, and A.C.-R.R., born in November 2013 (collectively, "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] We affirm.

We glean the factual and procedural history of this matter from the certified record, which the orphans' court has aptly summarized as follows:

> [T]his matter [began] in the juvenile division of the Berks County Court of Common Pleas. On January 19, 2021, Berks County Children and Youth Services ("CYS" or "the Agency") filed separate petitions seeking an adjudication of dependency as to [the Children] alleging a year-long engagement with Mother and her family[1] arising from concerns of domestic violence, neglectful parenting, inappropriate discipline, and substance abuse. . . . [Shortly thereafter, CYS received another report indicating that C.A.I.-T. had been sexually assaulted by her stepfather, A.R. **See** N.T., 10/12/23, at 73. Thereafter, Mother chose to disclose these events in a public TikTok video, which resulted in C.A.I.-T. being bullied and harassed at school. **See id.** at 101.]
>
> > [1] At the time, Mother was married to A.R., who is the father of E.C.R. and A.C.-R.R. By relation, A.R. was also C.A.I.-T.'s stepfather. Mother, A.R., and the Children occupied the family home together.
>
> On April 26, 2021, the dependency court reconvened for a full hearing . . . after which it adjudicated the Children dependent and

---

[1] A.R., the biological father of E.C.R. and A.C.-R.R., voluntarily relinquished his parental rights. **See** N.T., 10/12/23, at 68-69. In a separate decree entered the same day, the orphans' court also involuntarily terminated the parental rights of C.A.I.-T.'s natural father, M.M.I., after he failed to participate in these proceedings. **See id.** at 74-76. He did not appeal.

transferred custody to the Agency for placement in the kinship home of D.R. ("Maternal Grandmother") and O.R. ("Maternal Step-Grandfather") (collectively, "Maternal Grandparents"). The dependency court ordered Mother to cooperate with the following services and treatment: parenting education; mental health, domestic violence, and drug and alcohol evaluations and any recommended treatment; random urinalysis; establishing and maintaining stable and appropriate housing and income; notifying the Agency of any changes in income and residence; casework services through the Agency; and signing releases for all providers.[2] . . . .

> [2] The dependency court ordered supervised visitation [between Mother and the Children] once per week for two hours. . . . [T]he terms and frequency of visitation changed numerous times throughout the dependency proceedings until June 2023, when the court ordered visitations at the Children's option.

From the date of adjudication, Mother struggled with services. In certain ways, Mother demonstrated some improvement (most notably with her sobriety). By June 2022, the Children had been in placement for fifteen consecutive months. At that time, the Agency was still moving forward with the goal of reunification[.]

[On January 18, 2023, the dependency court determined that reunification was no longer feasible and changed the Children's permanency goals to adoption. Mother did not appeal. O]n January 19, 2023, the Agency filed separate petitions for involuntary termination of parental rights ("the Petitions"), which were premised upon the Children's uninterrupted status in placement for twenty-one consecutive months, together with Mother's inability to maintain consistent or adequate progress in her court-ordered services.

Orphans' Court Opinion ("O.C.O."), 1/12/24, at 2-3 (cleaned up).

On August 3, 2023, the orphans' court interviewed each of the Children

*in camera* with counsel for all parties present. At the time of these interviews,

C.A.I.-T. was thirteen years old, E.C.R. was eleven years old, and A.C.-R.R.

was nine years old.[2] At this juncture, the Children had been in kinship

placement with Maternal Grandparents for approximately twenty-five months.

_____

[2] Our Supreme Court has mandated that this Court conduct *sua sponte* review to ensure that the courts at the trial level have properly appointed counsel to represent the legal interests of children in contested termination proceedings in conformity with 23 Pa.C.S.A. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1234-36 (Pa. 2020). When counsel is appointed to serve as both a child's legal interest counsel ("LIC") and guardian *ad litem* ("GAL"), this Court must also *sua sponte* review whether "**the orphans' court** determined that the child's best interests and legal interests did not conflict." *Id.* at 1236 (emphasis added). It is well-established "that a single attorney cannot represent a child's best interests and legal interests if those interests conflict." *Id.* (citing *In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018).

At 1564 MDA 2023 and 1565 MDA 2023, Mark Zimmer, Esq. was properly appointed to dually serve as both GAL and LIC for E.C.R. and A.C.-R.R., after the orphans' court determined that there was no conflict in their respective interests. *See* Orders, 6/2/23 ("Attorney Zimmer has no conflict serving as both [LIC] and [GAL]."). This procedure fully comports with *K.M.G.* For reasons that are not clear from the certified record, however, the procedure concerning C.A.I.-T.'s legal representation is significantly different.

At 1563 MDA 2023, the court initially appointed Attorney Zimmer to serve as C.A.I.-T.'s GAL and appointed Barbara Beringer, Esquire, to act as her LIC. *See* Order, 5/23/23 (appointing Attorney Beringer as LIC); Order, 6/2/23 (appointing Attorney Zimmer as GAL). On July 26, 2023, Attorney Beringer withdrew from the case and Attorney Zimmer was appointed to serve as C.A.I.-T.'s LIC. *See* Order, 7/26/23 ("[Attorney Beringer's] appearance as the above-captioned child's [l]egal [c]ounsel is hereby withdrawn. [Attorney Zimmer] will be appointed as the child's [l]egal [c]ounsel as of July 26, 2023."). Unlike the appointment orders at 1564 MDA 2023 and 1565 MDA 2023, however, there was no concomitant conflict finding as to C.A.I.-T.

At the conclusion of the termination hearing, Attorney Zimmer attested that no conflict precluded his dual appointment in these cases. *See* N.T., 10/12/23, at 218 ("Well, first of all, I don't believe that there is any conflict with myself acting as both [GAL] and [LIC] for the children."). Critically, however, the orphans' court never ratified Attorney Zimmer's belated opinion on this point by issuing a definitive finding that C.A.I.-T's interests did not conflict. We
*(Footnote Continued Next Page)*

The Children uniformly testified that they did not wish to have any further contact with Mother. **See** N.T., 8/3/23, at 14-20, 31-35, 38-40.

On October 12, 2023, the orphans' court held an evidentiary hearing, wherein the Agency adduced testimony from, *inter alia*: Rebecca Mill, a caseworker from the Agency who testified extensively regarding Mother's engagement with her court-ordered services; Gerald Menaquale, the clinical director of Commonwealth Clinical Group ("CCG") who oversaw Mother's domestic violence treatment; and Kristen Murphy, a visitation supervisor with Signature Family Services ("Signature") who chaperoned Mother's visitations

---

emphasize that Our Supreme Court has placed the onus squarely and solely upon the orphans' courts to make conflict determinations when appointing dual GAL/LIC in contested termination cases. **See K.M.G.**, 240 A.3d at 1236. These findings must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel. **See id.** (noting that our inquiry concerning a conflict finding "can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel").

While Attorney Zimmer's above-quoted testimony arguably presented a sufficient basis for this Court to independently conclude no conflict existed, our Supreme Court has explicitly forbidden *sua sponte* appellate review of this very issue. **See id.** ("[W]e decline to authorize *sua sponte* appellate review of whether the record demonstrates that GAL/[LIC] had a conflict in representing both a child's legal interests and best interests."). Accordingly, this Court remanded to the orphans' court with instructions for it to issue a definitive finding concerning any potential conflict in C.A.I.-T.'s legal and best interests. **See** Remand Order, 5/22/24, at 1-2. In its response, the orphans' court affirmed that no conflict existed between C.A.I.-T.'s best and legal interests. **See** Supplemental Opinion, 6/12/24, at 1-7. We also note that the parties to the instant appeal declined to file supplemental briefs following this supplemental procedure. Thus, we find no structural error.

with the Children and provided her with parental counseling and drug screening services. Mother was also present and testified on her own behalf.

On October 13, 2023, the orphans' court filed respective decrees involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On November 6, 2023, Mother filed separate, timely notices of appeal at the above-captioned cases. Thereafter, Mother filed timely concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3] The orphans' court

_____

[3] At the termination hearings, Mother was represented by Susan K. Quirits, Esquire, who was the fifth attorney to represent Mother during these proceedings. On October 24, 2023, Attorney Quirits filed a petition to withdraw, citing a breakdown in the attorney-client relationship. While this withdrawal request remained pending, Mother submitted *pro se* notices of appeal in the above-captioned cases on November 6, 2023. Although Mother's filings constitute a clear violation of the prohibition against hybrid representation, these submissions were technically sufficient to preserve Mother's appellate rights. ***See, e.g.***, ***Commonwealth v. Moore***, 307 A.3d 95, 99 (Pa. Super. 2023) ("[T]his Court is required to docket a *pro se* notice of appeal even when the defendant is represented by counsel[.]"). Mother did not, however, submit *pro se* concise statements pursuant to Rule 1925.

The orphans' court held a withdrawal hearing on December 11, 2023 and permitted Attorney Quirits to withdraw. The orphans' court initially directed Mother to secure private representation. On December 15, 2023, however, this Court remanded the case for the limited purpose of determining whether Mother was entitled to court-appointed counsel and to ensure that her apparent decision to proceed *pro se* had been made knowingly, intelligently, and voluntarily in conformity with ***Commonwealth v. Grazier***, 713 A.2d 81, 82 (Pa. 1998). Ultimately, the orphans' court held a ***Grazier*** hearing on December 20, 2023, wherein it appointed Carmen R. Stanziola, Esquire, to serve as Mother's counsel. Following Attorney Stanziola's appointment, this Court directed her to file Rule 1925(a)(2)(i) and (b) statements in the above-
*(Footnote Continued Next Page)*

- 6 -

responded by authoring a cogent and extensive memorandum opinion pursuant to Rule 1925(a)(2)(ii) explaining its rationale for terminating Mother's parental rights.

Mother has set forth a single issue in this appeal: "Whether the [t]rial [c]ourt abused its discretion and/or erred as a matter of law in determining that the parental rights of [Mother] should be forever terminated under [23 Pa.C.S.A. § 2511(a)(1), (2)[,] and (5)]?" Mother's Brief at 12 (cleaned up). Although not explicitly stated in Mother's statement of the questions presented, we discern that Mother actually intends to challenge the orphans' court's findings pursuant to both Section 2511(a) and (b). *See id.* at 19-35 (collectively discussing Section 2511(a) and (b)).[4]Accordingly, we will address each of these related-but-separate claims *seriatim*.

_____

captioned cases by January 8, 2024. *See* Order, 12/27/23. On January 5, 2024, Attorney Stanziola timely complied by filing concise statements.

Mother did not comply with the requirements of Pa.R.A.P. 1925(a)(2)(i), which provides that the concise statement of errors complained of on appeal "shall be filed and served with the notice of appeal." Nonetheless, Mother fully and timely complied with the orphans' court's subsequent order to submit a concise statement. Accordingly, we discern no waiver on this ground. *See*, *e.g.*, *Interest of R.R.D.*, 300 A.3d 1077, 1080-81 (Pa. Super. 2023) (concluding that the late filing of a Rule 1925(b) statement in a Children's Fast Track appeal that did not prejudice either party did not require waiver); *see also*, *e.g.*, *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (same).

[4] Although filed by counsel, Mother's brief violates the requirements of both Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.") and 2119(a) ("The argument shall be divided into as many parts as there are questions to
*(Footnote Continued Next Page)*

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence,

_____

be argued; and shall have at the head of each part . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Specifically, Mother failed to list subsection (8) in her questions presented and to discuss each of the subdivisions of Section 2511(a) separately. However, we interpret Mother's brief as challenging the orphans' court's findings, generally, which included Section 2511(a)(8). ***See generally*** Mother's Brief at 22-29. This Court may dismiss matters wherein there are "substantial" defects in the brief of the appellant. ***See*** Pa.R.A.P. 2101 ("Conformance with Requirements"). Since these errors have not impeded our review, however, we decline to quash this appeal due to these technical deficiencies. ***See Commonwealth Bank, a Div. of Meridian Bank v. Iorio***, 679 A.2d 820, 830 n.2 (Pa. Super. 1996).

which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines that the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon Section 2511(a)(8) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an

agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). In this, the

statute recognizes "that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

Therefore, if a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

The extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned up). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

We will begin by reviewing the orphans' court's findings pursuant to Section 2511(a)(8). Initially, we note that the Children had been removed from Mother's care for approximately twenty-five months at the time they testified in August 2023, *i.e.*, well beyond the twelve-month time frame required by statute. Thus, the first prong of Section 2511(a)(8) is satisfied.

Turning to the second element of proof required by Section 2511(a)(8), Mother challenges the sufficiency of the evidence underlying the orphans'

court's findings. *See* Mother's Brief at 18 ("The record does not support the [orphans' court's] finding that there was clear and convincing evidence of adequate grounds for the termination of Mother's parental rights[.]"). The orphans' court summarized its challenged findings, as follows:

> From the outset, Mother maintained an openly hostile posture toward the Agency, its partner providers, and the Children's kinship caregivers. Through her decisions and actions, for which Mother alone is responsible, she saw her relationship with [the] Children deteriorate beyond repair, and she made little or no progress toward alleviating the significant concerns that brought the Children into care. Quite simply, there is no prospect that Mother would be in a position to reunite with the Children in a reasonable amount of time.
>
> Despite more time than ordinarily afforded under the law, and more opportunities, perhaps, than a similarly situated parent, she did not make the progress required to be reunified with the Children. Mother, herself, was in charge of her destiny. Instead of remedying the dysfunction and substantial safety concerns that resulted in placement, she treated the Agency with mistrust and, at times, defiance rather than as a partner. As a result, she has not demonstrated she can provide a safe, healthy, and permanent living environment for the Children.

O.C.O. at 34-35. Upon review, we conclude that the certified record amply supports the orphans' court's findings.

Ms. Mill testified that the Agency became involved with Mother's family after receiving reports of "inappropriate parenting, inappropriate discipline, [M]other's mental health, [M]other's substance abuse, and domestic violence within the home" between January 2020 and January 2021. N.T., 10/12/23, at 71. In connection with these concerns, Mother was directed to engage with a number of court-ordered services, including: (1) undergoing drug and

alcohol assessments and complying with the resulting recommendations; (2) maintaining stable and appropriate housing and employment; (3) undergoing a mental health assessment and complying with the resulting recommendations; and (4) engaging with casework sessions provided by the Agency. *See id.* at 76.

We begin by evaluating Mother's mental health concerns, which were the most significant aspect of termination in the above-captioned cases. Ms. Mill testified that Mother's initial mental health evaluation resulted in her being diagnosed with, *inter alia*, attention deficit hyperactivity disorder ("ADHD") and bipolar 2 disorder.[5] *See id.* at 16, 81, 154-55. The evaluation recommended that Mother continue with psychiatric treatment, medication management, and individual psychotherapy. *See id.* at 79-80. Mother enrolled in therapy and medication management through Creative Health Services. *See id.* at 79-80. Ms. Mill testified, however, that Mother only provided the Agency with limited documentation concerning her attendance at therapy sessions, while failing to provide any documentation to the Agency regarding her prognosis or substantive progress in therapy. *See id.* Overall,

---

[5] Mr. Menaquale described the nature of Mother's bipolar 2 disorder diagnosis as a mental affliction producing a persistent state of "hypomania." *See* N.T., 10/12/23, at 154. According to Mr. Menaquale, this iteration of the disease is a "condition where someone is always somewhat elevated, but they never reach the level to where that mood instability turns into a full-blown mania, which often will result in dysphoria and hospitalization." *Id.*

there were no concrete indications in the certified record that Mother had remedied the issues revolving around her mental health diagnoses.[6]

Along similar lines, Ms. Mill also reported that although Mother had successfully completed a domestic violence assessment, her participation in the recommended course of counseling through CCG that followed was inconsistent and erratic. Mr. Menaquale confirmed that Mother struggled with "anger," "reactivity," and "irritability" during this course of treatment. *See id.* at 140. He also testified that although Mother was enrolled in domestic violence therapy for an extended period of time, her underlying behavior did not improve. *See id.* at 142 ("[T]hroughout the case . . . frustration tolerance, irritability, reactivity appeared to be something that did not decrease over time. And there were, you know, questions as to why we continue to see that level of anger and reactivity over time."); *see also* CYS Exhibits 56-63, 104. Ultimately, Mother was unsuccessfully discharged from domestic violence treatment through CCG in February 2023. *See id.* at 82-83, 115, 145. She did not pursue any alternative treatment options. *See id.*

---

[6] For the first time at the termination hearing, Mother adduced a detailed report from Creative Health Services that was authored on June 13, 2023. *See* N.T., 10/12/23, at 196. This report, however, indicated only that Mother had "shown progress" in working on her mental health diagnoses, while simultaneously recommending that Mother should continue with both individual counseling and medication management. *See* Mother's Exhibit 3. Overall, we find that this report corroborates the orphans' court's conclusion that Mother had not yet fully addressed her mental health issues.

With respect to housing, Mother has lived in her own residence since October 2021, although "[s]he has been evicted or had evictions filed on multiple occasions" for non-payment of rent. *Id.* at 77, 110. Thus, Mother's housing remains unstable. In addition to a lack of financial stability in her housing, Ms. Mill averred that the cleanliness of the home has been an issue, including a persistent sewage back-up problem. *See id.* at 111.

Along similar lines, Ms. Mill also reported that Mother has unsuccessfully held several short-term jobs during these proceedings but has largely failed to maintain a reliable income. *See id.* at 78, 113. These concerns were echoed by Ms. Murphy, who reported that Mother struggled with consistent employment and appropriate household budgeting. *See id.* at 163-65.

As the orphans' court notes above, Ms. Mill testified that Mother had successfully completed her drug and alcohol assessment and the recommended courses of treatment. *See id.* at 79. Indeed, Mother was deemed sufficiently serious about her sobriety that she was eventually excused from participating in urinalysis screens by the court. *See id.* at 79, 113-14. Overall, there are no ongoing concerns about Mother's substance abuse problems or sobriety. *See id.* at 78-79. As this analysis reveals, however, this is the only area that Mother has successfully addressed.

Based upon the foregoing, we find sufficient support in the certified record for the orphans' court's conclusion that the issues that led to the removal of the Children continued to exist at the time of the termination

hearing. Regrettably, Mother's apparent willingness to address her substance abuse concerns does not change our conclusion in that it is not relevant to our inquiry on this point. ***See, e.g.***, ***In re M.A.B.***, 166 at 446. As detailed above, the certified record indicates that Mother had not sufficiently remedied the underlying removal conditions such that her prospective reunion with the Children was imminent at the time of the termination hearing. ***See In re I.J.***, 972 A.2d at 11.

Finally, we turn to the third and last element of Section 2511(a)(8), which addresses whether termination of Mother's parental rights would best serve the needs and welfare of the Children. ***See*** 23 Pa.C.S.A. § 2511(a)(8). The orphans' court determined that "[t]erminating Mother's parental rights will not detrimentally affect the Children. In fact, the Children advocated for themselves, both clearly and bravely, that they want nothing to do with their former life, including Mother." O.C.O. at 34. As above, we find strong support for the orphans' court's conclusions in the certified record.

Between April 2021 and April 2023, Ms. Mill reported that Mother participated in supervised visitations with the Children. ***See id.*** at 87. Mother's only unsupervised visitations with the Children occurred during the 2021 winter holidays. ***See id.*** at 87, 126. Mother never progressed to regular unsupervised visits. Although the visits were initially held in Mother's home, her inability to maintain her residence in an appropriate state of cleanliness and repair eventually led to the institution of community-only visits. ***See id.***

at 170. Accordingly, Mother's visitations were administered by Signature and Ms. Murphy starting in approximately February 2022.

Beginning in March 2023, Ms. Mill and Ms. Murphy both reported concerns regarding the visits and Mother's lack of proper judgment while interacting with the Children. *See id.* at 92-93, 171. An unsecured knife was discovered in her home. *See id.* In a separate incident, Mother was observed encouraging the Children to light an open fire in her backyard using hairspray in an unsafe manner. *See id.* at 93, 174-75. We are very disturbed to report that on another occasion, Mother encouraged one of the Children to steal a cash tip that had been left on a table at a local restaurant. *See id.* at 118, 172. Finally, equally disturbing, Ms. Murphy reported that Mother engaged in inappropriately boisterous behavior during a family trip to a swimming pool, which required the intervention of on-duty lifeguards to bring Mother's behavior under control. *See id.* at 173-74.

Mother has also engaged in inappropriate behavior that has been directly detrimental to the well-being of the Children. Specifically, she created and distributed a public TikTok video that disclosed A.R.'s sexual abuse of C.A.I.-T., which exposed her daughter to significant bullying and ridicule at school. *See id.* at 101. As a result of Mother's behavior, the Children began to express significant reluctance to continue participating in visits with Mother in early 2023. *See id.* at 93-94, 176-78. In May 2023, the court ordered that the Children would have the right to refuse future visits with Mother at their

own discretion. *See id.* at 94-95; CYS Exhibits 37-39. Thereafter, the Children have refused to participate. Thus, A.C.-R.R. and E.C.R. last visited with Mother on May 12, 2023, and C.A.I.-T.'s last visit with Mother occurred on May 19, 2023. *See* N.T, 10/12/23, at 99. Ms. Murphy testified that as a consequence of these events, Mother was unsuccessfully discharged from Signature in June 2023. *See id.* at 180.

Based on the foregoing, we find more-than-sufficient-support for the orphans' court's findings with respect to the third prong of Section 2511(a)(8). Thus, we observe no abuse of discretion or error of law in the orphans' court's conclusion termination was warranted pursuant to Section 2511(a).

We now turn to an assessment of the orphans' court's findings pursuant to Section 2511(b), which concerns the developmental, physical, and emotional needs and welfare of the Children. *See* 23 Pa.C.S.A. § 2511(b). In pertinent part, the orphans' court opined as follows on this point:

> Terminating Mother's parental rights will not detrimentally affect the Children. In fact, the Children have advocated for themselves, both clearly and bravely, that they want nothing to do with their former life, including Mother. The Children are strongly bonded to Maternal Grandparents, to whom they look for guidance, structure, love, affection, protection, and stability. To be sure it is now Maternal Grandparents who care for the Children. They present as a long-term resource who can continue to meet [the Children's] developmental, physical, and emotional needs and give [them the] life that every child deserves: one free of conflict, stress, fear, abuse, and neglect. Taking the Children from the place where, in their words, they feel safe "for the first time" would border on egregious if not unjust.

O.C.O. at 34. The certified record fully supports the orphans' court's findings.

With respect to the bonding analysis mandated by our Supreme Court, Ms. Mill testified that a bonding evaluation conducted in December 2022 revealed that the Children's respective bonds with Mother are best described as anxious and avoidant. *See* N.T., 10/12/23, at 108. The Children's own testimony also corroborates this conclusion. Specifically, C.A.I.-T. testified that Mother's inability to care for the Children had essentially transformed C.A.I.-T. into an involuntary parent by proxy. *See* N.T., 8/3/23, at 14-20. In this testimony, C.A.I.-T. expressed that she did not want any contact with Mother, nor did she view Mother as a parental resource. *See, e.g.*, *id.* Both E.C.R. and A.C.-R.R. similarly averred that they did not want any further contact with Mother. *See id.* at 31-35, 38-40.

In sharp contrast to the Children's fraught relationship with Mother, Ms. Mill's testimony reflects that the Children are well-loved and well-cared for in Maternal Grandparents' home. *See id.* at 104-07. Additionally, Ms. Mill averred that Maternal Grandparents ensure that the Children's individualized educational and medical needs are fulfilled. *See id.* at 105-07. Overall, Ms. Mill reported the Children were unequivocal in their desire to remain with Maternal Grandparents. *See id.* at 122 ("[T]hey were very clear in those conversations that the people that they trust to care for them are their grandparents."). The Childrens' own testimonies confirm that they wish to remain with Maternal Grandparents. *See* N.T., 8/3/23, at 14-20, 31-40.

Viewing this information in conjunction with the related findings above pursuant to Section 2511(a)(8), we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(b). Accordingly, we will affirm the decrees terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/09/2024